No. 32,517

TENA LAWSON, *Appellee*, v. THE BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF SUMNER, *Appellant*.

(61 P. 2d 1365)

 Opinion filed
November 7, 1936. 

*John Potucek,* county attorney, and *John Bradley,* of Wellington, for the appellant.

*Bert E. Church,* of Wellington, *W. L. Cunningham, D. Arthur Walker, Fred Leach* and *William Cunningham,* all of Arkansas City, for the appellee.

The opinion of the court was delivered by

DAWSON, J.: This was an action for damages for injuries sustained by plaintiff when a bridge on a county highway collapsed while she and her husband were riding across it in a Ford truck.

Plaintiff resided with her husband in Shawnee, Okla. He was engaged in manufacturing mattresses, and occasionally delivered a truckload of these articles at points in Kansas. About March 14, 1934, he started from Shawnee, Okla., with a truckload of mattresses which he planned to deliver at Salina. He was accompanied by his wife, the plaintiff in this action. The mattresses were disposed of, and thereafter Lawson and wife visited relatives in northern Kansas and Nebraska; and they were en route to their home in Oklahoma on the afternoon of March 19, 1934, on a country road in Sumner county, when they came to a bridge over the Ninnescah river. While crossing the bridge it collapsed; the center of the bridge fell into the river, carrying down the Lawson truck with it, with the consequence that plaintiff was severely, variously, and permanently injured.

Plaintiff's petition set out the material facts. She alleged that the bridge was defective and unsafe in specified particulars; that the chairman of the defendant board had actual knowledge and notice of its defective condition for more than five days prior to the accident; that the county board itself had ceased to use the bridge for the movement of its heavy road-grading machinery, and that a large amount of public traffic had also ceased to use the bridge for the same reason, to wit: its defective and dangerous condition; and that the chairman of the board had knowledge and notice of those facts for more than five days prior to the collapse of the bridge and its consequent injuries to plaintiff.

Defendant's answer admitted that on March 19, 1934, there was a steel bridge crossing the Ninnescah river on a county road about twelve and three fourths miles north and a mile west of Wellington, and that the bridge was maintained by the defendant board on a county highway. The defendant board alleged that the bridge was safe and suitable for traffic, denied that there were any apparent defects in the bridge, denied that the chairman of the board had actual knowledge or notice of defects in it for more than five days.

The board further answered that the bridge collapsed because plaintiff's husband had driven his truck violently against the steel members of the side of the bridge, which collision knocked them out of proper alignment, and thus the bridge was caused to fall; and that plaintiff's injuries were the result of the careless driving of her husband and without fault of the defendant.

Answering further, it was alleged that at the time of the accident plaintiff's husband was operating his truck without compliance with the operators' and chauffeurs' license act, that he had not obtained a license from the state of Kansas, and that he was not exempted from conforming with the motor-vehicle regulations of this state, all of which facts were known to this plaintiff; and that she and her husband were engaged in a common enterprise at the time of her accident, and that defendant was under no legal liability to her.

The cause was tried before a jury which returned a verdict in favor of plaintiff for $3,000, and answered special questions, some of which read:

"1. In the event you find for the plaintiff, please specify the character or kind of defect or defects that existed in the bridge on March 19, 1934. A. Trusses out of alignment.

"2. If you have specified any defects in the bridge in your answer to Question No. 1, please state the approximate date each of such defects became apparent or observable. A. June, 1923.

"3. If you find for the plaintiff, please specify the reason or reasons that constituted the proximate cause of the bridge falling. A. Failure of east truss.

. . . . . . . . . . . . . . . .

"5. If you find for plaintiff, please specify what defect or defects in said bridge were known to the chairman of the board of county commissioners. A. Trusses out of alignment.

"Also, please state the approximate date that such chairman acquired knowledge of said defects. A. 1930.

"Also, please state how or in what manner the chairman acquired his knowledge of said defects. A. From observation by being at the site of said bridge."

The usual post-trial motions were filed, argued and overruled, and judgment was entered on the verdict.

Defendant appeals, assigning various errors, the first of which deals with the question whether the chairman of the board of county commissioners had the prerequisite notice of the defective bridge for at least five days prior to the accident, so as to fasten liability on the county under the statute, R. S. 68-301.

On that point, a perusal of the record makes it clear, in our opinion, that the defective character of the bridge was notorious and of long standing. The bridge was a single span about 140 feet in length, resting on concrete abutments. The bridge was of the sort known as the "Pratt" type, the trusses being comprised of iron or steel posts, bars, counter bars, braces, and rods bound together in a sort of lattice work. These trusses served both as sides for the bridge and as supports for the bridge flooring. In short, it was the sort of light iron bridge which became familiar on Kansas rural highways forty years ago. So long as the trusses of this type of bridge remained in proper alignment and its posts and hanger bars kept their vertical positions those "Pratt" truss bridges served the traffic of their era satisfactorily. The heavier traffic of the present time has rendered this type of bridge obsolete. The bridge was forty-two years old when it fell into the Ninnescah river some twenty-five feet below, and caused the plaintiff's injuries.

In 1923 this bridge was damaged by a flood. Driftwood lodged against the bridge, which pushed its trusses out of alignment; the downstream side of the bridge bulged outward, so that the weight of the bridge no longer was supported through the center of gravity. At various times thereafter the defective condition of this bridge was brought to the attention of the county board and some make-shift repairs were made on it. In 1929, through some presumably lawful authority, signs were posted at each end of the bridge that it was dangerous to public travel. These signs stated in substance that the bridge "was condemned." These signs remained for three or four years, but disappeared about two years before the bridge collapsed. At one time and another for several years the defective condition of the bridge was the subject of discussion between the members of the county board and the county engineer and other persons. The county board repeatedly visited the bridge; and it is idle to argue that the chairman of the board did not have five days' notice of its defects. He had several years' notice and knowledge of

its defects, and the changing personnel of the chairmanship from time to time did not create exceptional intervals when the county would not have been liable if the bridge had collapsed to the injury of travelers within five days immediately succeeding any such change in the chairmanship of the board. When the bridge became defective and the chairman of the board had five days' notice of that fact, the county became and remained liable to any person thereafter injured because of such defect, so long as the defect remained unrepaired.

In *Barnes v. Rumford*, 96 Me. 315, 52 Atl. 844, plaintiff was injured on a defective highway in the town of Rumford, and sued for damages. The town defended on the ground that the officers responsible for the safety of the highway did not have the statutory twenty-four-hours' notice of the defect. The accident and the injury occurred in November, 1899. It was shown that the responsible highway officials for the preceding year, 1898, did have actual notice of the defect, and the trial court ruled that if the defective condition remained unchanged, notice to the responsible officers in 1898 would fulfill the statutory requirement. In affirming a judgment for plaintiff on appeal, the supreme judicial court said:

"The town is made chargeable with the consequences of the neglect of its officers to make the necessary repairs after receiving such notice of the defect, and it is immaterial whether the notice is to one of the officers for the municipal year in which the accident occurred, or for some previous year, provided the defective condition of the way remained unchanged." (p. 324.)

Defendant next contends that the trial court committed prejudicial error in permitting engineering experts to give opinion testimony that the bridge was unsafe for public travel, that this was a conclusion of fact for the jury to decide. In support of this contention defendant cites such cases as *Murray v. Woodson County*, 58 Kan. 1, 48 Pac. 554; and *Shouse v. Consolidated Flour Mills Co.*, 132 Kan. 108, 294 Pac. 657. The testimony of the engineer, Alford, in part, reads:

"Q. Have you an opinion what would be the effect on that bridge if the top cord was out of line some eighteen inches to the east? Answer that 'yes' or 'no.' A. I have.

"Q. What would be the effect on that bridge with the cord being out of line to that extent?

. . . . . . . . . . . . . . . . . .

"COURT: Objection overruled.

. . . . . . . . . . . . . . . . . .

"A. There would be an unusual strain on the members and probably would lead to failure of some of the members."

Other expert testimony objected to was to the same effect. However, when critically examined it will be seen that the witness did not testify as to the ultimate fact. Both question and answer were in conformity with good practice in eliciting from expert witnesses the evidential facts upon which the jury necessarily had to rely to determine the ultimate fact as to the safety of the bridge. (*Healer v. Inkman,* 94 Kan. 594, 146 Pac. 1172; *Bell v. Newkirk,* 136 Kan. 111, 12 P. 2d 733.)

It is next contended that plaintiff's husband had not complied with the regulations of the Kansas motor-vehicle act, and in consequence that plaintiff could not recover. If it should be conceded that the husband was operating his truck in Kansas without compliance with Kansas motor-vehicle regulations it is rather a startling *sequitur* that plaintiff herself was in some way culpable so as to bar her recovery. She was not shown to be engaged in a common enterprise with her husband, and such was not the fact. But the record does not show that even the husband was operating his truck in Kansas in plain violation of Kansas regulations. There appears to be some sort of reciprocal regulations on the Kansas-Oklahoma border, whereby private operators of motor trucks may pass and repass the state line in interstate commerce if their vehicles are licensed in the state of the operator's domicile. There also appears to be a regulation whereby the operator of a private truck is required to post with the highway commission a sum of money based upon the estimated mileage he expects to travel in the state into which he comes. Lawson had posted such a sum of money with the Kansas state highway commission, so in that respect he was not an outlaw. It is urged, however, that the time limit of his motor-vehicle license in Oklahoma had expired. That is superficially true, but it was shown that by the operative interpretation of the Oklahoma motor-vehicle regulations, a truck with a license for the year 1933 was tolerated on the highway until April 1, 1934. In Kansas, new motor licenses are required on January 1 of each year, but it is a matter of common knowledge that several weeks of each new year elapse before most of our motorists obtain their new licenses, due partly to the fact that the county treasurers could not possibly issue all the requisite licenses on January 1, nor would the courthouse yard be large enough to hold the crowd who would be entitled

to call and pay for their licenses on that day. In this action this court is not required to rule positively on the validity of these interstate motor-vehicle regulations enforced on the Kansas-Oklahoma state line. We content ourselves for the nonce to hold that the operation of the Lawson truck on the public highway in Sumner county was not shown to have been illegal, and that the circumstances under which it was so operated did not bar a recovery by this plaintiff.

The other objections to the judgment have been duly considered, but they do not warrant further discussion. The record is free from material error; there cannot possibly be any misgiving about the justice of the net result; therefore, the judgment is affirmed.